**CITY OF URBANA, Appellee,**

v.

**LOCKE, Appellant.**

[Cite as *Urbana v. Locke,* 170 Ohio App.3d 246, 2006-Ohio-6606.]

Court of Appeals of Ohio,
Second District, Champaign County.

No. 2005 CA 40.

Decided Dec. 8, 2006.

248

Nick A. Selvaggio, Champaign County Prosecutor, and Cathy J. Weithman, Assistant Prosecuting Attorney, for appellee.

David F. Axelrod, for appellant.

WOLFF, Judge.

{¶ 1} Floyd Locke appeals from a judgment of the Champaign County Municipal Court, which found him guilty of disorderly conduct, in violation of Sections 509.03(a)(3) and (a)(4) of the Urbana City Code, and imposed a fine of $35. On appeal, Locke asserts that his conviction was based on insufficient evidence, was against the manifest weight of the evidence, and unconstitutionally infringed on his right to free speech. He further claims that the trial court erred in failing to grant him a new trial. For the reasons set forth below, Locke's conviction is affirmed.

{¶ 2} According to the state's evidence, at approximately 11:30 a.m. on June 4, 2005, Locke and his wife went to Melvin Miller Park in Urbana, Ohio, to attend their son's youth baseball game. When they arrived, other earlier games were in progress, including a game on the field on which the Lockes' son would soon play, and there were many spectators. The Lockes set up their lawn chairs on the third-base side of the field, behind and to the home-plate side of the bleachers.

{¶ 3} Shortly after arriving, Locke noticed Vivian Neer, who was sitting with two other women and several feet to his right, smoking. According to Neer, Locke approached her and told her, "Excuse me. I'm allergic to smoke. Could you put your cigarette out?" Neer took a few more puffs on her cigarette and put it out. A few seconds later, Locke approached her again and stated, "Did you not hear me? I told you to put your cigarette out." Neer responded that she had put it out. Locke returned to his seat.

{¶ 4} A few moments later, Locke approached David Powell, who was standing with several men near a drainage ditch, which was located several yards behind Locke and to his left. Powell was also smoking. According to Powell, Locke pointed his finger at him and said, "You need to put that out. I'm highly

allergic." Powell responded, "You just need to go away." Locke then repeated, "You need to put that out." One of the men with Powell said, "We don't need this." Powell then told Locke, "I don't need this today." Powell flipped ash from his cigarette into the drainage ditch and put the cigarette butt in his pocket. Locke turned around and walked back to his seat.

{¶ 5} Shortly thereafter, Locke approached a woman seated in the bleachers and asked her to put out her cigarette. The woman apologized and put out her cigarette. At that point, Becky Powell, who was seated behind the Lockes' chairs, became upset at Locke's actions and told him that he should stop harassing people and that they had been there all morning. According to Thomas Shawler, Becky Powell's stepfather, Locke pointed a finger at them and said belligerently, "You people are smoking in front of me and my brother died of secondhand smoke." Shawler rose from his seat and demanded an apology, because neither he nor Becky had been smoking and Locke was making false accusations.

{¶ 6} Locke came up to the gate behind the umpire, Anthony Gonzalez, and asked him to call time. Locke said that there were people smoking at the park, and he asked Gonzalez to either tell them not to smoke at the park or eject them from the park. Gonzalez told Locke that he did not have the authority to tell the other parents not to smoke and that there were no signs in the park saying that individuals could not smoke. As stated by Linda Biddle, who was scoring the game, "The umpire tried to explain the rules to him, that [the woman who was smoking] was not around the children, that there was smoking permitted at the park but not in the dugouts, not on the field, not around the children, and she was away from people and asked [Locke] to please stop disrupting the game. But [Locke] kept on going on and on about it that she wasn't to be at the park smoking. She had to be out in the parking lot. And [the umpire] just kept asking him to stop. He was disrupting the game. And [Locke] kept going on about it, and then [the umpire] told him to leave the park. [The umpire] threw [Locke] out of the park." Gonzalez testified that the game was stopped for ten minutes while he spoke with Locke.

{¶ 7} Locke did not leave after being ejected by Gonzalez. Gonzalez went to speak with Todd Tracy, program director for the youth baseball program, to inform him that an individual was arguing with others, that he would not leave, and that someone had called the police.

{¶ 8} After his conversation with the umpire, Locke again argued with Becky Powell, who remained seated in her lawn chair. She told him that he should "move on, that he was disrupting what was going on [there]. There were people that were actually trying to watch their children play." Locke stepped close to her, gesturing with his arms, and responded, "What are you going to do about

it?" David Powell, who had approached upon seeing the argument between Locke and his wife, said, "She's not going to have to do anything about it; I will." At that point, an off-duty police officer, Carl Bader, who was also attending his son's baseball game, stepped between Becky Powell and Locke and said, "David, I've got it taken care of." Bader asked Locke to back up. Locke continued to complain about the smoking and asserted that he had a right to be there. Bader told Locke that the other parents had a right to smoke. Bader got a telephone from Sherri Reese, wife of Sergeant Reese, who was speaking with her husband at the police station. Bader advised Sergeant Reese of the situation. Locke walked to the concession stand to await the uniformed officers.

{¶ 9} Sergeant King, Officer Cordial, and Sergeant Reese were dispatched to the park. King testified that when he spoke with Locke about his being asked to leave, Locke said that he had a right to be there. King indicated that Locke was upset about the smoking and had asked some people to quit smoking. Locke had stated that the others were hostile toward him. Locke pointed out a sign at the concession stand, which stated, "Urbana Youth Sports asks that if you must smoke, please do so away from the playing field and others. We suggest the parking lot be the designated smoking area." Locke told the officers that they should enforce the no-smoking rule at the city park. When King told Locke that he needed to leave, Locke responded that King "was going to have to arrest him." King indicated that Locke would not be arrested and ultimately issued Locke a citation for disorderly conduct. The citation indicated that Locke had confronted smokers at a youth baseball game, caused a scene, stopped the ball game, and refused to leave.

{¶ 10} On September 26, 2005, a bench trial was held, during which 12 individuals testified. During his case-in-chief, Locke presented evidence that he had politely asked Neer, David Powell, and an unidentified woman to put out their cigarettes. He claimed that Becky Powell had responded to him belligerently. Locke testified that he had felt threatened by the crowd's behavior and that he had asked the umpire—the individual in charge of the game—to call time in the game so that the umpire could call the police. Locke denied that he had interfered with the game and thought that the umpire had ejected Becky Powell. He further testified that Bader, who did not identify himself as a police officer, stood within an inch of him, intimidated him, and told Locke that he had no right to ask the other spectators not to smoke. Locke requested that Bader call a uniformed officer and went to the concession stand to wait.

{¶ 11} Locke also presented the testimony of his wife and Hare to support his version of events. Both testified that Locke had politely asked three smokers to put out their cigarettes due to a nonsmoking rule and his allergy to smoke and that other spectators, particularly Becky Powell, had confronted Locke about his

requests. Hare testified that Becky Powell said, "You're always harassing people. The problem is yours. Why don't you leave the park instead of harassing everybody else." Hare further indicated that Powell came over and confronted Locke and that Hare would have felt threatened had he been Locke. Hare indicated that he got the attention of coach Ronald Burns and that they moved the children down the third-base line away from the confrontation. Hare and Locke's wife both indicated that Locke went to the umpire to seek assistance. Both further testified that Locke had not gotten close to Becky Powell and that Bader had gotten "nose to nose" with Locke and had acted in an intimidating manner. Locke also presented the testimony of Dr. Rodney Graber, a cardiologist, to substantiate his health condition.

{¶ 12} Becky Powell and Burns did not testify at the trial.

{¶ 13} At the conclusion of the trial, the court found Locke guilty of disorderly conduct and ordered Locke to pay a fine of $35, plus court costs. Locke appeals from his conviction, raising three assignments of error.

{¶ 14} I. "The municipal court erred as a matter of law by denying Mr. Locke's motion for acquittal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure and finding Mr. Locke guilty of violating Urbana City Code Sections 509.03(a)(3) and 509.03(a)(4) in the absence of sufficient evidence."

{¶ 15} In his first assignment of error, Locke claims that his conviction for disorderly conduct was based on insufficient evidence. As an alternative argument, he asserts that his conviction was against the manifest weight of the evidence.

{¶ 16} " '[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins* (1997), 78 Ohio St.3d 380, 386, 678 N.E.2d 541, citing Black's Law Dictionary (6th Ed.1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Dennis* (1997), 79 Ohio St.3d 421, 430, 683 N.E.2d 1096, citing *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.

{¶ 17} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly

lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, citing *State v. Martin* (1983), 20 Ohio App.3d 172, 175, 20 OBR 215, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. *State v. Lawson* (Aug. 22, 1997), Montgomery App. No. 16288, 1997 WL 476684 "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin*, 20 Ohio App.3d at 175, 20 OBR 215, 485 N.E.2d 717.

{¶ 18} Disorderly conduct is prohibited by Section 509.03 of the Urbana City Code. That ordinance, which is virtually identical to R.C. 2917.11, provides:

{¶ 19} "(a) No person shall recklessly cause inconvenience, annoyance or alarm to another by doing any of the following: * * *

{¶ 20} "(3) Insulting, taunting or challenging another, under circumstances in which such conduct is likely to provoke a violent response,

{¶ 21} "(4) Hindering or preventing the movement of persons on a public street, road, highway or right of way, or to, from, within or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender."

{¶ 22} "Recklessly" is defined by R.C. 2901.22(C) as follows: "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."

{¶ 23} Locke claims that the state failed to present sufficient evidence to support several elements of disorderly conduct. Locke asserts that he did not act recklessly, that his conduct was not likely to provoke a violent response, and that his actions in stopping the game were not unreasonable. Locke does not assert that his actions did not cause inconvenience or annoyance, and we find ample support in the record to conclude that his actions caused inconvenience, annoyance, or alarm within the meaning of Section 509.03 of the Urbana City Code.

## A. *Recklessness*

{¶ 24} Locke first argues that he did not act recklessly when he asked three people to stop smoking at a baseball game. He notes that the evidence at

trial established that he did not curse, verbally threaten another, call anyone names, raise a fist, or brandish a weapon. The witnesses further agreed that Locke did not physically interfere with the baseball game, such as by running onto the field or interfering with the players. No one responded to Locke with violence. He further notes that he had been told at a preseason meeting that spectators were supposed to smoke in the parking lot, and the concession-stand sign and the parents' code of conduct both requested that smoking take place in the designated smoking area.

{¶ 25} We agree with Locke that his actions in asking Neer, Powell, and a third individual to put out their cigarettes were not reckless. Even assuming that Locke had demanded, rather than requested, that they put out their cigarettes, that conduct, by itself, does not constitute recklessly insulting, taunting, or challenging another.

{¶ 26} Locke next asserts that his request that the umpire stop the game and enforce the league's nonsmoking policy cannot be construed as reckless. He argues that he reasonably believed that Gonzalez had the authority to stop the game, enforce the policy, and call the police. He further argues that his "desire to call the police and then waiting for the police to arrive cannot be construed as reckless behavior either."

{¶ 27} Again, we agree with Locke that he did not act recklessly when he approached Gonzalez. Gonzalez testified that he was an employee of the city of Urbana, that he was in charge if Tracy was not there, and that he had the authority to eject an unruly spectator. Tracy likewise stated that the umpires have control of the game. Accordingly, although Locke might have been wise to consider options other than interrupting the game—particularly one in which his child was not playing—he did not act unreasonably, at least initially, in approaching the umpire for assistance.

{¶ 28} After Locke was ejected from the park, however, the circumstances presented a whole new ball game. At that juncture, Locke had been asked to leave by a game official with authority to eject spectators—an authority that Locke does not dispute—and the court could have reasonably concluded that he acted with "heedless indifference" when he turned his back on Gonzalez and continued his confrontation with the Powells. Although Locke testified that he believed that Gonzalez had ejected Becky Powell, he testified that he did not leave when asked to leave by the umpire because he "had asked the umpire to call a police officer." Locke also stated that he did not leave because he thought that he had a right to be there.

{¶ 29} Significantly, several witnesses testified that after speaking with the umpire, Locke acted in an aggressive and belligerent manner. According to

Powell, when his wife told Locke that he "needed to go someplace else," Locke stepped toward Powell's wife, gestured, and asked, "What are you going to do about it?" Powell testified, "Mr. Locke, from what I observed, appeared to be extremely aggressive and stepped towards my wife closing a distance that I believed was unsafe given his behavior to my wife." Bader testified that Locke "confronted" Becky Powell and that Bader stepped between them to get Locke to back up. Linda Biddle, who was officially scoring the ball game, testified that after Locke was ejected, "one of the ladies said to him, '[T]he umpire told you to leave.' And then he * * * began walking toward the ladies and had his hands on his chest and was very belligerent saying, '[W]ell, what are you going to do about it[?]' " Biddle continued, "[H]e was being verbally aggressive and walking— invading their space. He was getting in their faces. * * * [Locke] absolutely was challenging the ladies [to a fight]." Several witnesses stated that as Locke was confronting Becky Powell, she was seated in her lawn chair. Accordingly, the state presented sufficient evidence that, after being ejected, Locke recklessly caused inconvenience, annoyance, or alarm by challenging Becky Powell.

{¶ 30} In support of his argument that he did not act recklessly, Locke cites *Cincinnati v. Summers*, Hamilton App. No. C–020624, 2003-Ohio-2773, 2003 WL 21242134. In *Summers*, the defendant was convicted of violating R.C. 2917.11(A)(3) based on evidence that he "was walking back and forth across the street at the crosswalk, dragging a sign and shaking a small black baseball bat over his head." Summers was a member of a group called the Black Fist, which protested allegations of police misconduct. On appeal, the court reversed the conviction. Although the court found evidence to support the conclusion that Summers had caused inconvenience or annoyance, it concluded that the city had failed to present sufficient evidence that Summers had acted recklessly or had taunted, insulted, or challenged passing motorists. The court reasoned:

{¶ 31} "Summers stayed within the crosswalk when crossing the street and presumably crossed with the light in his favor, as there was no charge of jaywalking. Further, both officers testified that they had not heard what Summers was saying to the passing motorists. Although there was testimony that Summers had raised his bat in the air and shaken it, neither officer said that Summers had swung his bat at any passing car. Simply protesting within the limits of the law did not reasonably support the inference that Summers was insulting, taunting, or challenging passing motorists. Further, from our review of the record, we hold that peacefully protesting in a crosswalk while raising a small bat in the air and yelling 'Black Power,' without swinging the bat so as to hit a passing vehicle, was not something that was likely to provoke a violent response."

{¶ 32} *Summers* is readily distinguishable. In *Summers,* the defendant's actions were not directed toward any motorist or pedestrians and there was no evidence that they were performed in a manner that was insulting, taunting, challenging, or potentially dangerous. Moreover, there was no evidence of insulting, taunting, or challenging statements. In contrast, Locke's actions were directed toward Becky Powell, were taken with an aggressive demeanor, involved challenging words ("What are you going to do about it?") and were performed after he had been ejected from the park. In sum, the trial court reasonably concluded that Locke recklessly caused inconvenience, annoyance, or alarm by challenging Becky Powell.

### B.  *Likely to Cause a Violent Response*

{¶ 33} Locke next argues that his actions were unlikely to cause a violent response, because no violence resulted from his actions and all of the state's witnesses denied personally feeling a violent compulsion against him due to Locke's statements to them. "A person may not be punished for speaking boisterous, rude or insulting words, even with the intent to annoy another, unless the words by their very utterance inflict injury or are likely to provoke the average person to an immediate retaliatory breach of the peace." *State v. Lamm* (1992), 80 Ohio App.3d 510, 513, 609 N.E.2d 1286.

{¶ 34} Several of the state's witnesses acknowledged that Locke did not call anyone names, did not hit anyone, did not orally threaten anyone, did not use profanity, and did not brandish a weapon. Locke cites several cases in which the appellate court held that there was no evidence that the defendant's actions were likely to provoke a violent response, despite causing inconvenience and annoyance. *State v. Wilson* (1995), 102 Ohio App.3d 1, 656 N.E.2d 954; *State v. Chevalier* (Sept. 26, 1995), Meigs App. No. 94CA22, 1995 WL 572905; *Lamm,* supra.

{¶ 35} Although Neer and Powell did not feel moved to violence by Locke's request that they cease smoking or move to the parking lot and the officers did not respond to Locke with violence, the state presented legally sufficient evidence that Locke's actions toward Becky Powell were likely to provoke a violent response. On direct examination, the prosecutor asked Powell, "[Locke's] actions towards his—towards your wife, did they respond to make you feel violent, provoke you?" Powell responded, "Yes. I believed that I was going to have to defend my wife's safety." Powell testified that he did not respond violently because Bader intervened. As stated above, Biddle testified that Locke "was getting in their faces and it was like he wasn't going to be happy until something happened." Biddle further indicated that she thought, "[T]his was going to be a fight." Although Powell's violent response was prevented by Bader's interven-

tion, the trial court could have reasonably concluded that Locke challenged Becky Powell under circumstances in which his conduct was likely to provoke such a response.

## C. *Obstructing the Baseball Game*

{¶ 36} Locke claims that his actions in stopping the game were not unlawful or unreasonable. He notes that he did not stop the game himself, he did not run onto the field, and he did not otherwise physically obstruct the game. Locke thus contends that his conviction under Urbana City Code Section 509.03(a)(4) cannot be based on that conduct.

{¶ 37} We agree with Locke that the state did not meet its burden of proving that he hindered or prevented the movement of persons when he approached the umpire and asked him to call time. The undisputed evidence at trial was that Locke approached the fence and requested the umpire to call time. Gonzalez testified that Locke said, "Excuse me, sir. Could you please tell these people to stop smoking or ask them to leave?" Gonzalez stopped the game and had a discussion with Locke regarding the smoking policy and the umpire's ability to ask spectators to refrain from smoking. There is no evidence that Locke interfered with the players or their equipment, went onto the playing field, or otherwise physically hindered the game from continuing.

{¶ 38} Locke notes that King testified that the only obstruction of movement for which he charged Locke was Locke's "stopping the baseball game." At trial, the state presented evidence that Locke had impeded Becky Powell's movement when he confronted her after his ejection. Although this conduct is not specifically referred to in the citation, in our view, the conduct alleged in the citation—i.e., that Locke had confronted smokers, caused a scene, stopped the ball game, and refused to leave—was sufficiently broad to encompass the entire incident.

{¶ 39} In our judgment, the state presented sufficient evidence that Locke hindered Becky Powell's movement. Although testimony varied as to how close Locke stood to Becky Powell and there was evidence that Becky ultimately stood up, Biddle testified that Locke was "in her face" and that she could not stand "without going over him." The trial court apparently credited Biddle's testimony, stating that Locke was "nose to nose with [Powell's] wife." Although the court could have reasonably rejected Biddle's testimony in this regard and credited the testimony that there was a greater distance between Locke and Becky Powell, we cannot find that the trial court erred in making its finding. Based on this evidence, the trial court could have reasonably concluded that Locke violated section 509.03(a)(4) of the Urbana City Code by hindering Becky Powell's movement.

{¶ 40} The first assignment of error is overruled.

{¶ 41} II. "The municipal court erred as a matter of law by convicting Mr. Locke for exercising his constitutional right to free speech."

{¶ 42} In his second assignment of error, Locke claims that his conviction violated his First Amendment right to free speech because he did not use fighting words and because none of the witnesses was actually provoked to violence.

{¶ 43} "Punishment for disorderly conduct based on spoken words is prohibited unless those words amount to 'fighting words.' " *Middletown v. Carpenter*, Butler App. No. CA2006–01–004, 2006-Ohio-3625, 2006 WL 1972061, ¶ 14, citing *State v. Hoffman* (1979), 57 Ohio St.2d 129, 133, 11 O.O.3d 298, 387 N.E.2d 239, and *State v. Wood* (1996), 112 Ohio App.3d 621, 627, 679 N.E.2d 735. "Fighting words" are words that are likely by their very utterance to inflict injury or to incite an immediate breach of the peace. *Carpenter* at ¶ 14; *State v. Thompson*, 95 Ohio St.3d 264, 265, 2002-Ohio-2124, 767 N.E.2d 251, citing *Chaplinsky v. New Hampshire* (1942), 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031. In determining whether language rises to the level of "fighting words," courts look at the circumstances surrounding the statements. *Carpenter* at ¶ 14.

{¶ 44} Locke was not convicted of disorderly conduct merely because he had asked individuals watching the youth baseball to stop smoking or to move to the parking lot, nor because he had argued with other spectators about their right to smoke. As stated by the trial court: "I agree with the defense. It was not about smoking. It is about the way in which I think that you [Locke] went about stopping the smoking which was not in a lawful way. It was taunting. It was challenging. It was certainly insulting, and it certainly was under circumstances that would be likely to provoke violence." The trial court credited the state's evidence that Locke had pointed a finger at Becky Powell, had acted belligerently and aggressively, had raised his hands in a threatening manner, had said to Becky Powell, "What are you going to do about it?" and had "invaded her space." The court expressly found that the others had perceived his physical demeanor as a threat. Accordingly, Locke's conviction was not based solely upon his spoken words, but also upon his aggressive conduct in confronting the other spectators, particularly Becky Powell, about smoking in the spectator area.

{¶ 45} The second assignment of error is overruled.

{¶ 46} III. "The municipal court erred as a matter of law by denying Mr. Locke's motion for a new trial."

{¶ 47} In his third assignment of error, Locke claims that the trial court erred in denying his motion for a new trial. First, he argues that his conviction violated his First Amendment right to free speech. Second, he claims that he did not learn that Biddle would testify as a rebuttal witness until after Hare had already testified, in violation of Crim.R. 16, and that he has discovered new

evidence that would have impeached her testimony. Because we have already rejected Locke's assertion that his conviction violated his First Amendment rights, we will address only his arguments regarding Biddle's rebuttal testimony.

{¶ 48} During the state's rebuttal, Biddle testified that Hare was not in the vicinity of the ball game when Locke first approached the fence. Biddle indicated that Hare and Burns had taken the children to an open area between all of the ball fields, where there was less of a crowd. Biddle stated that she became aware of the problem between Locke and other spectators about five minutes after the team, Hare, and Burns had walked away. Biddle further testified that Hare still was not in the vicinity when she thought a fight was about to occur, "because when I thought that a fight was about to break out, the first thing I looked around to see who was in the area, who could step in to stop this. * * * [Hare] was definitely not in the area." Biddle stated that Hare would be lying if he testified that he was present and observed the incident.

{¶ 49} On appeal, Locke claims that he learned after the trial that Biddle had a motive for undermining Hare's testimony. Specifically, Hare provided an affidavit that indicated that he had had "unfavorable encounters" with Biddle in the past regarding a school fundraising project in which Biddle was involved. Burns also provided an affidavit that he had seen Hare near the area where Locke was located, that he and Hare had moved the team away from the incident, and that Hare had then returned to the area of the incident.

{¶ 50} Crim.R. 33(A)(6) provides that a new trial may be granted when new evidence material to the defense is discovered that the defendant could not with reasonable diligence have discovered and produced at the trial. "Before a new trial can be granted upon the basis of newly discovered evidence, the defendant must show that the new evidence (1) discloses a strong probability that it will change the result if a new trial is granted, (2) has been discovered since the trial, (3) is such as could not in the exercise of due diligence have been discovered before the trial, (4) is material to the issues, (5) is not merely cumulative to former evidence, and (6) does not merely impeach or contradict the former evidence." *State v. McCaleb*, Greene App. No. 05CA155, 2006-Ohio-4652, 2006 WL 2578837, ¶ 24. The decision whether to grant a motion for a new trial is left to the sound discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse of discretion. *State v. Beavers*, 166 Ohio App.3d 605, 2006-Ohio-1128, 852 N.E.2d 754, ¶ 13.

{¶ 51} We find no abuse of discretion in the trial court's denial of the motion for a new trial. Accepting that Locke was unaware of Biddle's alleged bias against Hare until after the trial, the trial court could have reasonably concluded that Locke could have discovered this evidence before the trial.

Likewise, the parties were obviously aware of the presence of Burns at the ball game, and the court could have reasonably concluded that his evidence could have been presented at trial.

{¶ 52} In addition, the trial court could have reasonably concluded that the new evidence would not have changed the result of the trial. Although the new evidence may have suggested that Biddle desired to discredit Hare, her version of the events was consistent with the version offered by Powell and Bader in indicating that Locke had been aggressive and belligerent. Although Hare testified that Locke had spoken politely and had not done anything that would provoke others to respond in a violent manner, the trial court apparently chose to believe Powell, Biddle, and Bader. Moreover, although Biddle stated in rebuttal that Hare had not been present, the trial court already had testimony from Locke and Hare that Hare had been talking with Locke's wife when the incident began. Hare testified that he had observed Locke approach the three smokers and saw the Powells and other spectators confront Locke over his actions. Hare further testified that he had helped Burns move the children down the third-base line and had left the scene for approximately ten minutes to get his grandsons situated for their games. King also testified that he saw Hare during his investigation. Accordingly, the trial court already had evidence from which it could assess whether Hare's testimony regarding Locke's conduct should be credited. As the trier-of-fact in this case, the trial court could have reasonably concluded that the newly discovered evidence would not have altered the result and thus did not warrant a new trial.

{¶ 53} Finally, Locke claims that the state violated Crim.R. 16 by failing to disclose Biddle as a rebuttal witness. Locke's argument lacks merit. Even if Biddle was not disclosed as a rebuttal witness, Locke was informed that Biddle would be called to testify at trial and she did, in fact, testify during the state's case-in-chief. No more was required of the state.

{¶ 54} The third assignment of error is overruled.

{¶ 55} The judgment of the trial court is affirmed.

Judgment affirmed.

FAIN, J., concurs.

GRADY, P.J., concurs in part and dissents in part.

FAIN, Judge, concurring.

{¶ 56} I write separately merely to note two reservations. First, I regard this as a close case.

{¶ 57} Second, I would not find Locke's verbal statement to Mrs. Powell to be sufficient, in itself, to support his conviction for disorderly conduct. As I understand the facts, Mrs. Powell asked Locke to leave, and Locke responded by saying, "What are you going to do about it?" In my view, this statement, by itself, is merely a disagreeable, if not rude, negative response to Mrs. Powell's request that Locke leave. It is equivalent to the classic negative response, "You gonna make me?" The average person would take that response as an indication that the person asked to leave is not going to do so voluntarily, but will have to be either physically forced to leave or suffered to remain. The average person would not, in my view, take that response, rude though it unquestionably is, as an indication that physical violence is imminent. The person being responded to, and any supporters of that person present, have the peaceful option of allowing the responder to remain (though perhaps leaving themselves).

{¶ 58} But, as Judge Wolff notes in his opinion for the court, the trial court found that there was more to Locke's actions than his verbal statement. The trial court found that Locke had invaded Mrs. Powell's personal space and raised his hands in a threatening manner and that others present perceived Locke's physical demeanor as a threat. In my view, Locke's actions accompanying his words permit a finding that he went beyond expression protected by the First Amendment and violated Urbana's disorderly conduct ordinance. As Judge Wolff notes in his opinion for this court, the trial court could also find, on conflicting evidence, that Locke hindered Mrs. Powell's movement, in violation of Section 509.03(a)(4) of the ordinance, which is an independent basis for his conviction.

{¶ 59} Because I do not find anything in the opinion of this court that conflicts with my opinion set forth herein, I concur in both the opinion and judgment of this court.

GRADY, Presiding Judge, concurring in part and dissenting in part.

{¶ 60} I do not agree that the evidence was sufficient as a matter of law to prove a violation of Urbana City Code Section 509.03(a)(4). That provision, which is identical to paragraph (A)(4) of R.C. 2917.11, the disorderly conduct section, states:

{¶ 61} "No person shall recklessly cause inconvenience, annoyance or alarm to another by * * * (h)indering or preventing the movement of persons on a public street, road, highway, right-of-way, or to, from, within or upon public or private property, so as to interfere with the rights of others, and by any act that serves no lawful and reasonable purpose of the offender."

{¶ 62} R.C. 2917.11(A)(4) has been the basis for prosecution when picketers or protestors block the flow of traffic on the public streets and highways. See *State*

*v. Sullivan* (Sept. 30, 1982), Portage App. No. 1159, 1982 WL 5669; *State v. Gregorino* (Sept. 3, 2004), Portage App. No. 2003–P–0071, 2004 WL 1960092. That kind of outcome is the specified result of the conduct that R.C. 2717.11(A)(4) prohibits.

{¶ 63} Judge Wolff finds sufficient evidence that Locke violated Urbana Codified Code Section 509.03(a)(4) because a witness testified that when Locke confronted Becky Powell as she sat in her seat, she could not have stood up without going over him. However, though Mrs. Powell subsequently stood up after Locke backed off, the evidence does not demonstrate that Locke prevented any effort she had made to do that. Whether she might have wanted to is too speculative to satisfy the reasonable-doubt standard that a criminal conviction requires.

{¶ 64} R.C. 2901.04(A) provides that "sections of the Revised Code defining offenses or penalties shall be strictly construed against the state, and liberally construed in favor of the accused." The rule likewise applies to municipal ordinances. We are required to determine whether the evidence was legally sufficient to support a conviction and, in doing so, must construe the evidence most strongly in favor of the state. Even so, application of Urbana Codified Code Section 509.03(a)(4) to find a violation on these facts is so inapt that it reverses the respective rights and burdens that R.C. 2901.04(A) imposes.

{¶ 65} Nevertheless, I agree that the evidence was sufficient as a matter of law to convict Locke of a violation of Urbana City Code Section 509.03(a)(3), which prohibits recklessly causing inconvenience, annoyance, or alarm to another by "[i]nsulting, taunting or challenging another, under circumstances in which such conduct is likely to provoke a violent response." In making that determination, an objective standard must be applied. *State v. Wilson* (1995), 102 Ohio App.3d 1, 656 N.E.2d 954.

{¶ 66} When Mrs. Powell objected to Locke's conduct, he stepped close to her, gestured with his arms, and asked, "What are you going to do about it?" At that point Mrs. Powell's husband intervened, telling Locke, "She's not going to have to do anything about it. I will." An off-duty police officer then stepped between Mrs. Powell and Locke, averting any action by Mr. Powell, who testified that he believed he was going to have to defend his wife's safety.

{¶ 67} Mr. Powell's belief was subjective, but on an objective standard, I would find that Locke's conduct was likely to provoke a violent response of that kind. Such a response is not limited to the person taunted or challenged. The response could just as likely come from that person's husband when his wife is the object of a defendant's misconduct.

{¶ 68} Construing this evidence most strongly in the state's favor, as Crim.R. 29 requires, reasonable minds could find beyond a reasonable doubt that Locke acted recklessly in taunting or challenging Mrs. Powell in a way that was likely to produce a violent response. Therefore, the evidence was sufficient to prove a violation of Urbana City Code Section 509.03(a)(3), and the trial court did not err in so holding.